# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**COLEMAN & WILLIAMS, LTD.,**

        **Plaintiff,**

v.                                                   Case No.  05-C-0466

**STATE OF WISCONSIN DEPARTMENT
OF WORKFORCE DEVELOPMENT and
ROBERTA GASSMAN,**

        **Defendants.**

---

## DECISION AND ORDER

Plaintiff Coleman & Williams, Ltd., an African-American owned accounting firm, brought this action in state court against the Wisconsin Department of Workforce Development ("DWD"), a state agency, and its Secretary, Roberta Gassman ("Gassman"). Plaintiff alleges that defendants violated 42 U.S.C. §§ 1981 and 1983 when Gassman made defamatory statements about its performance as the auditor of the Opportunities Industrialization Center of Greater Milwaukee ("OIC"), an entity providing services to Milwaukee's African-American community, and defendants removed it as OIC's auditor and from DWD's list of approved providers of accounting and auditing services. Plaintiff seeks injunctive relief and damages. Defendants timely removed the case and now move to dismiss the complaint for failure to state a claim. Plaintiff moves to amend the complaint to add a state law defamation claim.

## I. BACKGROUND AND ALLEGATIONS

Pursuant to a contract with DWD, OIC administered the Wisconsin Works ("W-2") program in Milwaukee. (Bernstein Aff. Ex. 1.)[1] For certain purposes, OIC was a division of DWD and required to use an accountant/auditor approved by DWD. Prior to 2004, plaintiff was approved by DWD as a provider of accounting and auditing services and provided such services to OIC. (Id. Ex. 2.)[2] Around 2004, OIC became the subject of a federal investigation involving mismanagement and corruption. The investigation led to the criminal convictions of OIC's chief operating officer, Carl Gee, counsel, Mark Sostarich, and a state senator, Gary George, who was closely associated with OIC.[3]

In 2004, DWD removed plaintiff as OIC's auditor. On February 10, 2005, the Milwaukee Journal-Sentinel quoted Gassman as stating that plaintiff "gave a false picture" of OIC's finances. (Compl. ¶ 6.) On February 13, 2005, the same paper quoted Gassman as stating that plaintiff "provided extremely inaccurate information" about OIC's finances and that if it had done a better job of auditing, OIC "would have had information that would have allowed them to correct and address problems." (Compl. ¶ ¶ 7 & 8.) On February

---

[1]Exhibit 1 to Bernstein's affidavit is a copy of the contract between DWD and OIC for the period January 1, 2004 to December 31, 2005. The contract is a public record. I may take judicial notice of public records in addressing a motion to dismiss. Palay v. United States, 349 F.3d 418, 425 n.2 (7th Cir. 2002).

[2]Exhibit 2 to Bernstein's affidavit consists of a copy of DWD's approved accounting and auditing services contract and a list of approved providers of such services. These documents are also public records of which I may take judicial notice.

[3]The convictions are also public records, of which I may take judicial notice. See United States v. Gee, No. 03-CR-259 (E.D. Wis. Jan. 25, 2005) (judgment); United States v. Sostarich, No. 03-CR-260 (E.D. Wis. Mar. 11, 2005) (judgment); United States v. George, No. 03-CR-259 (E.D. Wis. Aug. 11, 2004) (judgment).

14, 2005, DWD informed plaintiff that as a result of its performance as OIC's auditor, DWD had removed it from its list of approved providers of accounting and auditing services. On February 22, 2005, the State of Wisconsin Investment Board notified plaintiff that based on the newspaper articles it was re-evaluating its use of plaintiff's services. On March 2, 2005, Gassman advised the state legislature that DWD had relied on plaintiff's annual audits of OIC that regularly gave it a clean bill of health.

Plaintiff alleges that Gassman's statements about it were false and that her statements and its removal as OIC's auditor and from DWD's list of approved providers of accounting and auditing services were racially motivated.

## II. MOTION TO DISMISS

**A.    Legal Standard**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted. Gen. Elec. Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1080 (7th Cir. 1997). I may grant a Rule 12(b)(6) motion only if it is clear that the plaintiff can prove no set of facts in support of its claims that would entitle it to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The essence of a Rule 12(b)(6) motion is not that the plaintiff has pleaded insufficient facts; it is that even assuming all of the facts alleged are accurate, the plaintiff has no legal claim. Payton v. Rush-Presbyterian-St. Luke's Med. Ctr., 184 F.3d 623, 627 (7th Cir. 1999). In ruling on such a motion, I assume that all of the facts alleged in the complaint are true, and I draw all reasonable inferences from those facts in the light most favorable to the plaintiff. Bethlehem Steel Corp. v. Bush, 918 F.2d 1323, 1326 (7th Cir. 1990).

3

## B. Claims Against DWD

Section 1983 authorizes civil rights plaintiffs to recover against certain "persons." However, a state is not a "person" under the statute, and a suit against a state agency is treated as a suit against the state. Will v. Mich. Dept. of State Police, 491 U.S. 58, 70 (1989). Thus, I must dismiss plaintiff's § 1983 claim against DWD.

In addition, the Eleventh Amendment bars suits against states unless the state has waived its immunity or Congress has abrogated such immunity. Id. at 66. For purposes of the Eleventh Amendment, a suit against a state agency is treated as a suit against the state. Alabama v. Pugh, 438 U.S. 781, 782 (1977). With respect to plaintiff's § 1981 claim, plaintiff does not argue that DWD has waived its Eleventh Amendment immunity. Further, in order to abrogate state immunity, Congress must have demonstrated an unequivocal intent to do so either in the language of a statute or in legislative history. Quern v. Jordan, 440 U.S. 332, 345 (1979). Although there is some indication that Congress intended § 1981 to apply to state conduct, see Daisernia v. New York, 582 F. Supp. 792, 801-02 (N.D.N.Y. 1984), the Seventh Circuit has held that § 1981 claims against states are barred by the Eleventh Amendment, Rucker v. Higher Educ. Aids Bd., 669 F.2d 1179, 1184 (7th Cir. 1982). Thus, I must also dismiss plaintiff's § 1981 claim against DWD.

## C. Claims Against Gassman

### 1. Official and Personal Capacity Claims

In its complaint, plaintiff avers that it sues Gassman in her official and personal capacities. A suit against a state official in her official capacity is a suit against the state

4

and barred by the Eleventh Amendment. Kentucky v. Graham, 473 U.S. 159, 169 (1985). Similarly, a state official acting in an official capacity is not a "person" within § 1983. However, a suit against a state official in her official capacity that seeks prospective relief is not treated as an action against the state, and a state official named in such a suit is a "person" under § 1983. Will, 491 U.S. at 71 n.10. Thus, plaintiff's official capacity claims against Gassman are barred except to the extent that they seek prospective relief.

Personal capacity claims seek to impose personal liability upon a government official for actions taken under color of state law. Graham, 473 U.S. at 165. Such claims do not implicate the Eleventh Amendment. Moreover, Gassman, in her personal capacity, is a "person" within § 1983. Thus, neither the Eleventh Amendment nor the requirement that a § 1983 action be directed at a person bars plaintiff's personal capacity claims against Gassman.

### 2. Section 1983 Claim

In order to prove a violation of § 1983, plaintiff must establish that Gassman deprived it of a federal constitutional right while acting under color of state law. Bublitz v. Cottey, 327 F.3d 485, 488 (7th Cir. 2003). The Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty or property, without due process of law." U.S. Const. amend. 14 § 1. Plaintiff alleges that while acting under color of state law, Gassman deprived it of liberty without affording it due process. The type of claim that plaintiff seeks to assert is sometimes known as a "stigma-plus" claim. In order to state such a claim, plaintiff must allege that a state official made a stigmatizing statement about it and, incidental to such statement, altered its status in a tangible way or deprived it of a right that the state previously recognized. See Paul v. Davis, 424 U.S. 693, 701, 711-12

5

(1976); see also Siegert v. Gilley, 500 U.S. 226, 234 (1991); Doyle v. Camelot Care Ctrs., Inc., 305 F.3d 603, 617 (7th Cir. 2002). Plaintiff alleges that Gassman made defamatory statements about it and incidental thereto removed it from DWD's list of approved providers without granting it a hearing.

Before determining whether plaintiff states a stigma-plus claim, I must consider whether, as a corporation, it may assert such a claim. The Supreme Court has held that corporations are protected by some constitutional provisions but not others. For example, corporations have a constitutional right of access to the federal courts, are protected by the First Amendment's guarantee of a free press, and are entitled to freedom from unreasonable search and seizures, equal protection under the Fourteenth Amendment, and protection against double jeopardy. On the other hand, corporations are not citizens within the meaning of the privileges and immunities clause and are not protected by the privilege against self-incrimination. Lawrence Shire, Recent Decision – Government Contracts – Nonresponsibility Determinations – the Federal Government Violates a Contractor's Due Process Liberty Interest by Failing to Provide Prior Notice and an Opportunity to Rebut Charges Contained in Nonresponsibility Determinations Based on Lack of Integrity – Old Dominion Dairy Products, Inc. v. Secretary of Defense, 631 F.2d 953 (D.C. Cir. 1980), 50 Geo. Wash. L. Rev. 90, 96 (1981). Moreover, the Court's decisions concerning the constitutional rights of corporations lack a unifying rationale. Id. at 105; see also Carl J. Mayer, Personalizing the Impersonal: Corporations & the Bill of Rights, 41 Hastings L.J. 577, 579 (1990) (arguing that the Supreme Court lacks a theory of the corporation and a coherent explanation as to why corporations are entitled to the protection of some constitutional provisions and not others).

With respect to the Due Process Clause, the Court has long considered the property interests of corporations to be entitled to constitutional protection. See Louis K. Liggett Co. v. Baldridge, 278 U.S. 105, 111 (1928). However, the Court has been less clear about whether corporations have liberty interests that are safeguarded by the Fifth and Fourteenth Amendments. In three early cases, the Court held that corporations did not have such interests. Pierce v. Soc'y of Sisters, 268 U.S. 510, 535 (1925); W. Turf Ass'n v. Greenberg, 204 U.S. 359, 363 (1907); Nw Nat'l Life Ins. Co. v. Riggs, 203 U.S. 243, 255 (1906). However, the Court's more recent decisions in Grosjean v. American Press Co., 297 U.S. 233 (1936), and First National Bank v. Bellotti, 435 U.S. 765 (1978), suggest that its earlier holdings are no longer viable. In these later decisions, the Court permitted corporations to assert First Amendment rights – Grosjean involved freedom of the press and Bellotti free speech – and thus implied that corporations can assert liberty interests of some sort. See also Old Dominion, 631 F.2d at 962 n.19 (citing Grosjean and Bellotti for the proposition that corporations have liberty interests protected by due process). Assuming that corporations have such interests, however, the Supreme Court has not clarified the scope of the interests.[4]

---

[4]The Supreme Court has never fully defined "liberty." In Allgeyer v. Louisiana, 165 U.S. 578 (1897), the Court held that liberty includes the right to pursue a lawful calling. Id. at 591. In Meyer v. Nebraska, 262 U.S. 390, 399 (1923), the Court stated that while it had

> not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness

7

Any analysis of the application of constitutional protections to corporate activity must begin with the premise that a corporation is only fictionally an entity, existing simply for convenience in defining the relationships between members of a group and the responsibilities of the group to individuals and institutions outside it.  See Allen K. Easley, Buying Back the First Amendment:  Regulation of Disproportionate Corporate Spending in Ballot Issues Campaigns, 17 Ga. L. Rev. 675, 711 (1983); see also David L. Ratner, Corporations & the Constitution, 15 U.S.F. L. Rev. 11,12 (1980-81) (stating that "a corporation should not be viewed as a person or as an agency of government but as a technique, a method of arranging relationships among individual people").  Thus, the question of whether a corporation is protected by certain constitutional guarantees does not depend on whether corporations are "persons" or on whether corporations are capable in one context or another of "activity."  If a corporation is simply an arrangement created by a group of individuals, the question of whether it is entitled to the protection of a particular constitutional guarantee turns on whether the guarantee was intended to protect a group as well as an individual.  Easley, supra, at 711.  The Supreme Court made a similar point in Bellotti, stating that to determine whether a constitutional guarantee is available to a corporation, a court must analyze "the nature, history and purpose of the particular constitutional provision."  435 U.S. at 765 n.14.

---

by free men.

Id. (citations omitted).  Some liberties, like freedom of speech, are specifically mentioned in the Constitution while others, such as freedom from stigma to reputation, are implicit in the concept of liberty itself.  Shire, supra, at 97 n.60.

8

As to the question in the present case, whether a corporation may assert a Fourteenth Amendment liberty interest of the "reputation-plus" type, the cases on point hold in the affirmative. In Old Dominion, a government contractor declared ineligible to bid for contracts based on an agency's conclusion that it lacked integrity brought an action claiming a denial of due process. In response to the government's argument that the corporation lacked a liberty interest, the court reasoned that although a corporation did not have a right to be awarded a government contract "'that cannot mean that the government can act arbitrarily, either substantively or procedurally, against a person or that such person is not entitled to challenge the processes and the evidence before he is officially declared ineligible for government contracts.'" 631 F.2d at 962 (quoting Gonzales v. Freeman, 334 F.2d 570, 574 (D.C. Cir. 1964)). The court went on to hold that the corporation could challenge the government's actions notwithstanding that it had no property interest in the award of the contract.

The Court of Appeals for the District of Columbia also recently reaffirmed the proposition that stigmatizing statements plus formal debarment or broad preclusion of a contractor from bidding on government contracts implicates a liberty interest. Trifax Corp. v. District of Columbia, 314 F.3d 641, 643-44 (D.C. Cir. 2003) (stating that the constitutional "liberty" concept protects corporations as well as individuals); see also Transco Sec., Inc. v. Freeman, 639 F.2d 318, 321 (6th Cir. 1981) (stating that a corporation that contracts with the government has a liberty interest in not being blackballed based on charges of fraud or dishonesty without procedural safeguards); accord A.T.L., Inc. v. United States, 736 F.2d 677, 683 (Fed. Cir. 1984) Allocco Recycling, Ltd. v. Doherty, 378 F. Supp. 2d 348, 363 (S.D.N.Y. 2005) (stating that the Due Process

9

Clause encompasses the right to engage in any of the common occupations of life, and that this concept of liberty protects corporations as well as individuals).[5]

Further, the purpose served by the Fourteenth Amendment's protection of an individual's reputation-plus type of liberty interest is also furthered by applying the protection to a group of individuals who have chosen to organize as a corporation. Such individuals would likely be as concerned about the organization's reputation and ability to carry on a business as an individual would be about his or her reputation and ability to pursue a business or profession. Moreover, a governmental entity should not be any more free to arbitrarily harm an organizations's reputation and ability to carry on a business that it is to harm an individual's reputation and ability to pursue a business. An analogy to the Equal Protection Clause may be apt. The Fourteenth Amendment's equal protection guarantee speaks of protecting persons but in its primary application – to prevent race discrimination – it is readily apparent that it must also be viewed as protecting groups. Thus, the guarantee protects a group that has formed a corporation. See Easley, supra, at 711 (citing Santa Clara County v. S. Pac. R.R. , 118 U.S. 394, 396 (1886)); see also Pembina Consol. Silver Mining & Milling Co. v. Pennsylvania, 125 U.S. 181, 188-89 (1888) (stating that "[t]he inhibition of the [Fourteenth] Amendment that no State shall deprive any

---

[5]In National Paint & Coatings v. City of Chicago, 45 F.3d 1124, 1131 (7th Cir.1995), in the context of determining whether in a suit brought by corporations under a substantive due process theory a court could strike down an ordinance banning the sale of spray paint as a means of combating graffiti, the Seventh Circuit noted in dicta that corporations have no liberty interests. However, National Paint is distinguishable from the present case because the issue there was not whether corporations have Fourteenth Amendment liberty interests protected by procedural due process, but rather whether corporations have fundamental rights derived from the structure of the Constitution that are protected by substantive due process.

10

person within its jurisdiction of the equal protection of the laws was designed to prevent any person or class of persons from being singled out as a special subject for discriminating and hostile legislation").

Thus, for the foregoing reasons, I conclude that the corporate plaintiff in the present case may assert a claim alleging the deprivation of a reputation-plus type of liberty interest. However, such conclusion does not resolve the question of whether plaintiff actually states a claim for relief. As previously indicated, in order to state a stigma-plus claim, a plaintiff must allege that a state official made a stigmatizing statement about it and, incidental to such statement, altered or extinguished a tangible status or right that the plaintiff previously possessed and that the state previously recognized. Paul, 424 U.S. at 701, 711-12. The statement in question will not be considered stigmatizing if it merely characterizes the plaintiff as incompetent. Rather, it must impugn the plaintiff's integrity such that it makes it virtually impossible for the plaintiff to pursue an occupation. See Doyle, 305 F.3d at 617. However, if the plaintiff is a government contractor and alleges that incidental to the stigmatizing statement the state formally debarred or informally precluded it from government contracting, it will have satisfied the requirement that it allege the deprivation of a tangible status or right. Trifax Corp., 314 F.3d at 643-44 (stating that both "formal debarment" and "broad preclusion" from government contracting "would constitute a deprivation of liberty").

I conclude that plaintiff has satisfactorily pleaded a stigma-plus claim. Plaintiff first alleges that Gassman made stigmatizing statements about it including statements that it "gave a false picture" of and "provided extremely inaccurate information" about OIC's finances. (Compl. § 6 & 7.) Gassman argues that such statements are not stigmatizing

11

because they do not impugn plaintiff's integrity. However, taking the statements in the light most favorable to plaintiff, they may be read as suggesting that plaintiff intentionally gave a false picture of OIC's finances. It is particularly plausible to read Gassman's statements in this way in the context of the scandal that surrounded OIC, which involved corruption and criminality. So read, the statements impugn plaintiff's integrity.

Gassman also argues that plaintiff fails to allege that incidental to the stigmatizing statements, it suffered a tangible alteration of status. However, as previously indicated, when a government contractor alleges that incidental to making a stigmatizing statement, a government official debarred or precluded it from further government work, the plaintiff alleges a tangible alteration of status. See Trifax, 314 F.3d at 643-44; Transco Sec., Inc., 639 F.2d at 321; Old Dominion, 631 F.2d at 962. In the present case, taking plaintiff's allegations in the light most favorable to it, plaintiff alleges that Gassman stigmatized it and incidental thereto removed it from DWD's list of approved accountants and auditors thereby eliminating it from future government contracting. Thus, plaintiff alleges a tangible loss or alteration of status sufficient to survive Gassman's motion to dismiss.

Gassman also argues that plaintiff fails to allege her personal involvement in removing it from DWD's list of approved providers of services. A person cannot be held liable in a § 1983 action unless she caused or participated in the deprivation of a constitutional right. Wolf-Lillie v. Sonquist, 699 F.2d 864, 869 (7th Cir. 1983). However, taking the allegations in the light most favorable to plaintiff, plaintiff alleges that Gassman personally caused it to be removed from DWD's list of approved providers. Plaintiff alleges that Gassman "was the person responsible for establishing and enforcing DWD's policies," (Compl. ¶ 18), and expressly complains of "the actions of the DWD and Gassman in

12

removing Coleman & Williams from the DWD's list of presumptive suppliers of accounting and financial services." (Id. ¶ 24.)

Thus, plaintiff has alleged denial of a protected liberty interest. The question of what process a plaintiff is entitled to prior to such a deprivation depends on a variety of factors. Mathews v. Eldridge, 424 U.S. 319 (1976). I need only say at this point in the proceeding that by alleging that Gassman did not provide it with a hearing in connection with her statements and actions, plaintiff alleges a violation of due process.

### 3. Section 1981 Claim

Plaintiff also alleges that Gassman violated § 1981 by discriminatorily removing it as OIC's auditor and from DWD's list of approved providers, thus impairing its right to make contracts. Among other rights, § 1981 confers on "all persons . . . the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." To prevail in a § 1981 claim, a plaintiff must establish intentional and "purposeful discrimination." See Gen. Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 391 (1982). Gassman argues that plaintiff fails to state a claim under § 1981 because it does not allege that it had a contractual relationship with DWD and because it does not assert its § 1981 rights pursuant to a claim under § 1983. I address each of these arguments below. However, I first address whether, as a corporation, plaintiff may assert a claim under § 1981.

Plaintiff alleges that it is a "minority owned and operated" firm and that Gassman discriminated against it because it was "African-American owned." (Compl. ¶¶ 2 & 23.) Although the Supreme Court has indicated in dicta that "a corporation . . . has no racial identity and cannot be the direct target of . . . discrimination," Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 263 (1977), courts have frequently concluded that

13

minority owned corporations may bring actions to vindicate rights protected by § 1981, see, e.g., Rosales v. A.T.& T. Info. Sys., Inc., 702 F. Supp. 1489, 1494 (D. Colo. 1988) (stating that courts have permitted corporations to assert § 1981 claims where due to its ownership or management the corporation had a minority racial identity); Howard Sec. Servs., Inc. v. Johns Hopkins Hosp., 516 F. Supp. 508, 513 (D. Md. 1981) (holding that a corporation could assert a claim under § 1981 against a hospital for failure to award it a contract to provide security services because the corporation apparently was wholly owned by its black president, and the hospital allegedly failed to award the contract to the corporation because of the president's race); see also T&S Serv. Assoc., Inc. v. Crenson, 666 F.2d 722, 725 (1st Cir. 1981); Org. of Minority Vendors, Inc. v. Ill. Cent. Gulf R.R., 579 F. Supp. 574, 588 (N.D. Ill. 1983).

I conclude that a corporation may assert rights under § 1981 but not because of its racial identity (assuming that a corporation can have a racial identity). Rather, I reach such conclusion because it serves the purpose of § 1981 to permit a corporation that suffers harm as the result of racial discrimination to vindicate rights protected by the statute. The purpose of § 1981 is "to proscribe discrimination in the making or enforcement of contracts against, or in favor, of any race." McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 295 (1976). Because the statute targets discrimination, any person or entity that suffers harm from discrimination proscribed by the statute may bring an action under it. Thus, an individual need not be a member of a minority group to sue under § 1981. See, e.g., Des Vergnes v. Seekonk Water Dist., 601 F. 2d 9, 13-14 (1st Cir. 1979) (stating that whites may bring § 1981 actions if they suffer injuries as a result of their activities with or on behalf of African-Americans), vacated on other grounds, 453 U.S. 807 (1981). Similarly,

corporations that suffer harm as the result of discrimination may bring actions to vindicate rights protected by the statute. Gersman v. Group Health Ass'n, Inc., 931 F.2d 1565, 1568 (D.C. Cir. 1991), vacated on other grounds, 502 U.S. 1068 (1992). In the present case, plaintiff alleges that Gassman's discriminatory conduct impaired its right to make contracts. Plaintiff's claim is not barred because it is a corporation.

Gassman contends that I must dismiss plaintiff's § 1981 claim because plaintiff had no contractual relationship with herself or DWD. However, to state a § 1981 claim a plaintiff need not allege the existence of a contractual relationship with the defendant. Rather, it is sufficient for the plaintiff to allege that the defendant discriminatorily used its authority to prevent the plaintiff from securing a contract with a third party. Harris v. Allstate Ins. Co., 300 F.3d 1183, 1197 (10th Cir. 2002); see also Daniels v. Pipefitters Ass'n Local Union No. 597, 945 F.2d 906, 914-15 (7th Cir. 1991) (stating that there is no privity of contract requirement protecting parties from § 1981 liability). However, for a plaintiff to prevail on a § 1981 claim based on the defendant's discriminatory interference with its ability to contract with a third party, the plaintiff must show that the defendant possessed sufficient authority to significantly interfere with its ability to obtain contracts with third parties, and that it actually exercised such authority to the plaintiff's detriment. Harris, 300 F.3d at 1197; see also Vakharia v. Swedish Covenant Hosp., 765 F. Supp. 461, 471-72 (N.D. Ill. 1991) (stating that § 1981 prohibits discriminatory interference with right to make contracts with a third party); accord Morrison v. Am. Bd. of Psychiatry & Neurology, Inc., 908 F. Supp. 582, 587-88 (N.D. Ill. 1996); Shirkey v. Eastwind Cmty. Dev. Corp., 941 F. Supp. 567, 573 (D. Md. 1996). In the present case, plaintiff alleges that, as the Secretary of DWD, Gassman had the authority to remove it from a list of approved

15

providers, that she exercised such authority discriminatorily and, as a result, prevented it from contracting with third parties. Thus plaintiff alleges a violation of its rights under § 1981.

Gassman also contends that I must dismiss plaintiff's allegations with respect to § 1981 because plaintiff fails to present them in the form of a § 1983 claim. Gassman points out that in <u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701, 733 (1989), the Supreme Court held that § 1983 provided the "exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units," and she argues that such holding survives Congress's 1991 amendments to § 1981. I decline to dismiss plaintiff's § 1983 claim for two reasons. First, under federal pleading rules, a plaintiff need only put the defendant on notice of the nature its claim and does not have to plead a theory. <u>See, e.g.</u>, <u>McDonald v. Household, Intern. Inc.</u>, 425 F.3d 424, 428 (7th Cir. 2005). In the present case, plaintiff put Gassman on notice of its § 1981 claim. Plaintiff was not required to specify the theory on which its claim rested.

Second, I disagree that the <u>Jett</u> holding that a plaintiff may only assert § 1981 rights pursuant to a claim under § 1983 survives the 1991 amendments. Rather, I conclude based on the text of § 1981 and the modern implied remedy doctrine, that Congress overturned such holding. The 1991 amendments added several sections to § 1981, one of which, section (c), provides that "the rights protected under this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." In enacting section (c), Congress intended to ensure that § 1981 would apply equally to public and private action. See Allison M. McKeen, <u>Civil Rights – "A Mere Paper Guarantee?": Congressional Intent, Judicial Manipulation and the Current State of</u>

16

Municipal Liability Under 42 U.S.C. § 1981, 27 W. New Eng. L. Rev. 133 (2005). Courts are divided on whether the amendment provided § 1981 plaintiffs with an independent claim against state actors. The most persuasive decision on point is Fed'n of African- Am. Contractors v. City of Oakland, 96 F.3d 1204, 1210-15 (9th Cir. 1996), in which the court held that the amendment impliedly created a right of action under the statute after applying the four factor test created by the Supreme Court in Cort v. Ash, 422 U.S. 66, 78 (1975).

The court acknowledged that amended § 1981 does not explicitly provide an independent claim but pointed out that without employing words of limitation, § 1981 protects "against impairment by nongovernmental discrimination and impairment under color of State law," and concluded that such language suggests that Congress intended for plaintiffs with claims against state actors to be able to bring § 1981 actions independent of § 1983. Fed'n of African-Am. Contractors, 96 F.3d at 1213. The court also noted that one of Congress's purposes in amending § 1981 was to codify Runyon v. McCrary, 427 U.S. 160 (1976), and thus ensure that § 1981 rights would be protected against private actors. In essence, Congress's intent in adding § 1981(c) was to codify an implied claim; the text of § 1981 still does not expressly provide a claim against private actors, and yet, the clearly stated purpose of the amendment was to provide one. By analogy, the court determined that it was reasonable to imply a claim against state actors based on Congress's instruction to apply § 1981 equally to state and private actors. Fed'n of African-Am. Contractors, 96 F.3d at 1213. Further, the court noted that in amending § 1981, Congress intended to provide appropriate remedies for intentional discrimination and that implying an independent claim against state actors would advance this purpose. Id. The court also concluded that implying a direct cause of action under § 1981 was consistent

17

with the purpose of the statute and found that it did not conflict with traditional notions of federalism. Id. at 1214.

Jett distinguished between § 1981 actions brought against public and private actors. Before the 1991 amendments, the language of § 1981 was neutral as to how it applied to different defendants, so it may have been defensible for the court to draw this distinction. In the present form, however, the plain text of the statute does not support this reading. McKeen, supra, at 163. The language in § 1981(c), which protects rights "against impairment by nongovernmental discrimination and impairment under color of State law," makes no distinction between actions brought against private and state actors. It is incorrect to assume that Congress intended § 1981 to be read differently depending on the status of the defendant, since there is nothing in the words of the statute with which to justify this difference in treatment. Id. at 163-64.

## II. MOTION TO AMEND

Plaintiff moves for leave to amend its complaint to add a supplemental state law claim of defamation against Gassman, and Gassman argues on several grounds that I should deny the motion. Fed. R. Civ. P. 15(a) governs amendments to pleadings, and it authorizes a party to amend "once as a matter of course at any time before a responsive pleading is served." Under the rule, only subsequent amendments require leave of court or consent of the adverse party. Further, a motion to dismiss is not a "responsive pleading." Textor v. Bd. of Regents, 711 F.2d 1387, 1391 n.1 (7th Cir. 1983). In the present case, plaintiff has not previously amended its complaint, and DWD and Gassman have not filed a responsive pleading. Thus, plaintiff may amend its complaint without

obtaining my leave or Gassman's consent.  Therefore, I will deny its motion to amend as moot.

### III.  CONCLUSION

Therefore, for the reasons stated,

**IT IS ORDERED** that defendant DWD's motion to dismiss is **GRANTED**, and defendant Gassman's motion to dismiss is **DENIED.**

**IT IS FURTHER ORDERED** that plaintiff's motion to amend is **DENIED AS MOOT.**

Dated at Milwaukee, Wisconsin this 17 day of November, 2005.

/s_____
LYNN ADELMAN
District Judge